Welcome to the Ninth Circuit. Before we begin, Judge Baya and I want to thank Judge Bennett from Maryland for joining us today and helping us out. We really appreciate it. Thank you, Judge Lee, and it's my high honor to be here and be a member of the panel today. One quick housekeeping matter. We have submitted three cases on the briefs and the record. They are U.S. v. Rose, U.S. v. Wooten, and Olivares v. Garland, and those have been submitted already. So the first case we have for argument today is Cavanaugh v. County of San Diego. And, Mr. Richards, you may begin, and please let us know if you want to speak. Pardon me, Judge Lee. Have we submitted Centeno-Olivares v. Garland? Yes, we have. Okay, thank you. Mr. Richards, you can begin and let us know if you want to save some time for rebuttal. Thank you very much, Justices of the Ninth Circuit. I appreciate your attention very truly on behalf of my client and his family. Deputy Counsel, Senior Deputy, Mr. Kish, it's always a pleasure to see you. Again, it's been a while. It's been a pleasure litigating this case with you. I would like to reserve, if I may, Justice Lee, three minutes for rebuttal towards the end, so I'll attempt to get through my presentation as quickly as I can for the substantive version of the case. As I see the substantive version of the case, one of the strongest objections that we have to this is that the matter was not decided on its merits per se, but it was decided on a motion to dismiss, which sat on the Court's desk for a number of months. We actually had a deadline for the motion for summary judgment, which was the following day after the ruling on the motion to dismiss. In between the time we had filed the motion to amend, they had filed the motion to dismiss, 12B6. We had taken 19 depositions in the case, including expert witnesses who had made opinions based on causation, timelines, and effect, and we were ready to go to trial at that point. Our objection is that the case should have been heard as a motion for summary judgment. It should have been heard on its merits, at least through a motion process, and so we would have been able to show fact for fact to the Court rather than talk about pleading stages. Mr. Richards, may I interrupt you for a second? Did you make a motion before the District Court to convert the motion to dismiss into a motion of summary judgment? We did not do that. We were waiting for the ruling on the motion to dismiss, but you are correct, Your Honor. We did not do that. That's absolutely accurate. We didn't know when it was coming out, but that is an accurate statement. The issue on the motion to dismiss is twofold. One is the deliberate indifference standard, which was raised by County Council in their papers, also discussed quite at length by the Court in its 100-page ruling. Also, the second major issue is the qualified immunity standard that was brought into the case. Under the deliberate indifference standard, under Twombly and Iqbal, which basically says plaintiff is to provide a short and plain statement of the claim, showing that the pleading and the pleader is entitled to relief. It should contain sufficient facts to make conclusions, to make accepted inferences that should be found on behalf of the non-moving party, and that is the standard that we have. In this case, factually, we have shown that there was an emergency button that was in the cell of the decedent, Mr. Bullinger. The sole purpose of that button was to provide and summon medical aid. That button went directly to a control tower that sat in the center of a jail that sat in a horseshoe configuration around the tower, and the alarm button had been turned off. Mr. Richards, may I interrupt you again? Would you point to any allegations of specific facts, such as required by Iqbal and Twombly, to show that there was a heightened risk of suicide within the meaning of Kahn v. City of Reno? I think there's two ways that one can look at that, Your Honor, as well. One is the larger picture, which is a screening issue, which I think the Court is getting at, which is that if someone is checked into a facility as a pretrial detainee who is coming off heroin, who is withdrawing from heroin, that's documenting that they're withdrawing from heroin in the medical record, do they provide a heightened sense of a suicidal risk? I think the statute in San Diego, the statistics, rather, prove that. Is there any allegation that any of the defendants in this case was made aware that Mr. Bollinger, if I'm pronouncing it correctly, was a heroin addict coming off? Yes. In his intake form, he admitted that he was using cocaine and heroin on a daily basis. Was that intake form filled out and shown to any of the defendants? Yes, Your Honor. Where was that allegation? Was that part of the record, his medical record? No, no, no. Let's be precise. Yes, sir. There are staff members of the San Diego establishment, and the defendants are staff members. Yes, Your Honor. But my question is, was the heroin addiction and the detoxification made known to these defendants personally, not through any imputed respondeas superior imputation? I understand the question, and it's a good question, Your Honor. The answer is yes, because part of the procedure of watching these inmates is to know their medical condition. Where in your complaint is that allegation made? That allegation was not made directly that they did part of the intake process. We did make it known in our complaint. He went through the formal intake process, which noted on a formal level his daily withdrawal from heroin. Let me ask you— I'd also like to segue, if I—I'm sorry, Your Honor. Let me ask you once again. Yes. Is there any allegation of specific fact in the complaint showing that any of the named defendants, in this case, read or was told by anyone that— I don't know that the complaint is that specific. —the Bollinger was coming off heroin. I know that they have a duty and they're charged to know the medical condition of these inmates that they're watching as part of their job and that he officially was noted as a heroin withdrawal. But I would like to segue real quickly into the second more microanalysis that I have. The court, and so has the trial court, looked at this as if the only medical condition that he had was checking in under withdrawal. I'm saying that his medical condition was a ligature around his neck, and that once the ligature was around his neck and he turned blue, he had a significant medical condition which would have been ameliorated by pressing the emergency button in the cell. The procedures say they could have gotten down there in 68 minutes. Our expert witness said, had they gotten down there in that period of time, removed the ligature from his neck, that he wouldn't have suffered any long-term care. He certainly wouldn't have died. That is our expert's opinion going into trial. So yes, there is this broader that he had a significant medical condition. Simply by being in a state of withdrawal of heroin, I'm suggesting and stating that under a pleading, he had a real imminent danger of medical condition once the ligature was around his neck, which is what the button was designed to prevent. And we can go look at the Lemur case, which is a similar case where there was someone who was hanging in a cell. They were begging the staff to come get them off of the ligature, and those courts held that that was not covered by qualified immunity, and also the pleading was delivered indifferent simply by not getting down there. So again, I do appreciate that the court's looking at this in two different ways. The broader take of just when we have this mass of opiate addiction in this country, what are the obligations of jailers to have to become physicians essentially? And I can appreciate that concern. However, there are policies that allow them to intervene and prevent suicide. But what I'm stating is our factual analysis and what we intend to take to the jury is that once the ligature was on his neck and they began banging on the door, that he had a specific real medical condition of hypoxia. Mr. Richards, if I can interrupt just for a moment. Mr. Bollinger denied feeling suicidal, did he not? Does not the record reflect that he denied? To be honest with you, from the chart, I do not remember that suicidal issues were an issue. According to my review, I could be wrong, but I understood that he not only acknowledged that he was addicted to narcotics generally, but he denied feeling suicidal, did he not? He could have, Your Honor. I'm not denying that. I don't remember what he had said other than that. What is your theory of causation then in terms of particularly for holding the county liable? Is it his suicide or failing to treat his asphyxiation? What is the theory? One of the 19 depositions we took was a family member who said they called into the jail to let the jail know that he was in fact suicidal and that they spoke with the deputy and they put the deputy on notice. This is, again, getting back to why I think it should have been heard on its merits because this is one of the factorial merit-based allegations that we have is a family member saying, I called in. I said that he is suicidal. I put them on notice. None of that was able to be heard before the court simply by the way that the ruling came out in the 12B6. Your Honor, your theory? If I could just follow up just on one point on that just to make sure if I can zero in on this. You allege that there was a violation of county policy with respect to turning off the alarm, correct? Isn't that in your papers that you allege that? Yes. Under your Monell claim? Yes, Your Honor. And my question is how can there be a Monell claim when there's an express county policy that you indicate in your pleadings was violated? It would certainly seem to me that that means that there's how can there be a violation of a pattern or practice under Monell if you say the very county policy was violated when it comes to any potential liability of the county apart from the officers? I understand. One of the Monell factors is that it allows for a custom and practice to come in before the jury even if that is in violation of the written policy that the county people are dealing with. So if they have a county policy that says X but they all do Y all of the time and that is a policy that is known to them, the Monell and his progeny accept that as being a continual following of a policy even though it's an informal policy. Your point, though, is correct. They do have a statute that says you can't turn off this, and somebody turned it off. We know that for certain. The depositions, the 19 depos we took, indicated it was Dixon. Even though the judge suggested that it was the prior deputy parent, the parent in his deposition said, I never touched that button. Dixon said, I did touch it. I might have touched it. I don't remember if I did in this particular case. So we have someone who's violating the express policy by turning off this button, and the reasons he turned off the button was because he didn't want to be bothered with sports scores and requests for pizza. So, I mean, if we put that fact up against saving someone's life who is a pretrial detainee who has not been convicted of anything, who's suffering from a medical condition, clearly a withdrawal of heroin, and we put that up against turning off an alarm because a deputy didn't want to be bothered by a request for pizza, I think that we really get into the area of it being properly pled for deliberate indifference. I think that is the definition of deliberate indifference. A deputy that is acting in their own comfort level rather than in the safety level of those he's charged or she would be charged with watching. That is my presentation on the merits of the court. Has any other questions? I see this as being our request is that this be remanded, that at the very least this matter be heard on summary judgment with the 19 depositions that we had be included as a factual analysis of whether this case should prevail. I think that it is on the Sixth Amendment. It is central to our entire thesis of jurisprudence that we hear cases on their merits, that we don't dismiss them on tacticalities, that we don't dismiss them on procedural grounds, particularly when the merits are clearly available in this case. We put the work in in the case. We did the 19 depositions. We have the expert reports. We have the expert depositions. We ask the court to remand and to allow the case to be heard on its merits through a summary judgment process. And I thank you very much for your time. All right. You have a minute and 50. You may have two minutes for rebuttal. Thank you. Mr. Kish? Good morning, and may it please the court. My name is Fernando Kish, and I represent the appellees in this matter. A person cannot be deliberately indifferent to a medical need that is hidden or unknown. Although this case is a tragic jail suicide, and on behalf of the appellees, I extend the appellant our condolences, this fundamental truth cannot be altered. Appellant's allegations and his argument here, although long on conclusory hyperbole, is short on factual detail. Those allegations make clear that none of the appellees had reason to know that Mr. Bollinger intended to harm himself. Appellant's allegations also make clear that the deputies responded and rendered medical aid when they first became aware that the ligature had been applied by Mr. Bollinger. Mr. Kish, let me interrupt you for a second. One thing struck me in the record of the allegations was that one of the, I think it's one of the appellees, one of the defendants said in reporting this event that he had a, quote, a hanger, unquote, a hanger in a cell. That struck a note that this was not an unusual event in the San Diego prison system, that they've had other suicides by hanging. When you put that together with the fact that the staff was told that this man was a heroin addict and was being detoxed, isn't that sufficient to infer that the police officers here charged had some knowledge of a risk of suicide by addicts who were being detoxed? No, Your Honor, and let me address that in a couple of ways. First, with respect to the use of the word hanger, I would agree with the court that it is probably not the best word to use. However, that isn't suggestive that any of the deputies in this particular case and the deputy that specifically uttered those words had any prior information to suggest that Mr. Bollinger specifically had any heightened risk of suicide. With respect to any indication that that's a regular occurrence in our county jails, I would argue that jail suicides as a general proposition is not unique or unheard of. And more likely that that deputy's experience in terms of jail suicide comes from training because that is something that is often part of a jail deputy's experience in terms of being trained. Is that all the more reason for not turning off the intercom button? I don't think there's any question that lowering the intercom button might not be a good idea. However, the question isn't whether or not that's a good idea or not. The question is whether or not it rises to the level of a constitutional violation. What's the intercom? What is the intercom system used for? There are a variety of reasons. In this case, appellants argue that it's an emergency button, but in practice and in reality, it is used for several mundane communications from inmates for a variety of different things. And it's true that we are confined to the allegations of the complaint, but there's nothing that requires the court to abandon common sense and not consider the reasonable plausibility that the intercom button is used for other things. In addition, appellants incorporated by reference and asked for judicial notice of the CLERB report. And that report contains much more information that appellant references in his brief. For instance, it contains the medical screening information that's conducted by medical staff that Justice Bea referenced. And it includes specific questions regarding suicide. Because appellants included that report or incorporated that report by reference, it is part of the allegations that the court can properly consider. Going back to the intercom, I know I used your argument that it's negligence, not reckless disregard for turning it off. But suppose for the 911 system, they turned it off. They're not going to pick up 911 calls. And certainly, there are probably a lot of false alarms, 911 calls. Some people call because their cat is stuck up on a tree and clearly non-emergency calls. But obviously, you will also have emergency calls. So if a city or county stops picking up its 911 calls for a few hours or for 30 minutes or an hour, would that still be negligence instead of reckless disregard? I think that would be a different scenario altogether. And some of the details of that particular case and circumstance would need to be looked into. However, in this particular case, keep in mind that the intercom button, in addition to the audio alarm, also has visual alerts. So just because a deputy decides that he works better in a very busy control room to lower the volume of an audio alarm because it may go off often for mundane reasons. And he can tend to them by observing and monitoring his computer screen. That in and of itself doesn't suggest even negligence, much less a deliberate indifference standard that would be required to support the plaintiff's claims in this particular case. The simple fact is that whoever muted the button, and that's an issue to begin with, right? And appellant's inability to do that despite having completed discovery is something that the court can in and of itself decide is a deficiency in the complaint. And to Mr. Richard's point in argument here, to the extent that he found out in discovery certain information that identified clearly who it was, then it was incumbent upon appellants to raise that issue before the district court. Nothing prevented them from seeking leave to amend their complaint a second time because they've gotten dispositive information regarding who muted the button. May I ask you this? Mr. Richards made mention that a family member had called into the jail to describe Bollinger as a suicide risk. Why isn't that sufficient evidence to give a heightened risk basis to the defendants? For a couple of reasons. In this context, we're on a motion to dismiss stage. That accusation was not contained within the appellant's complaint. It was only raised in opposition to our motion to dismiss the second amended complaint. More importantly, even if the court were to accept that as part of the allegations in the complaint, it is insufficient as against the deputies in this particular case to put them on notice that Mr. Bollinger presented any heightened risk when they were interacting with him. Keep in mind, according to Mr. Richards' statements of what that deposition said or what that family friend says, is that they called the jail the day he went into the jail and reported some generalized risk of suicide, but they don't identify who that was reported to, only that it was reported to jail staff. It's important to clarify that there's medical staff in the jail and the medical personnel tend to the medical issues. There's important rights regarding privacy in terms of medical information that isn't conveyed to deputies and shouldn't be conveyed to deputies. Jail deputies don't have access to the entirety of an inmate's medical records, as Mr. Richards may suggest. Instead, they're only informed of information that's necessary to address their issues. And if, for instance, someone really did have a heightened risk of suicide, they would be put in an enhanced observation cell or maybe even a safety cell, depending on the evaluation of the medical staff. But none of those allegations are included in this complaint, and they couldn't be. We've completed discovery. Mr. Richards and I know full well what happened. That isn't part of the discussion here because it would be improper. It's outside the context of what's in the complaint. If I can just follow up, Mr. Kish, on Judge Lee's question in terms of this intercom button being more than just an alarm system, to what extent, when you say that the visual alerts still remain activated, to what is the record with respect to the activity of those visual alerts in the context of this case? By plaintiff's own allegations, Deputy Dixon, the control tower deputy, did not hear or see the alerts until the man down call came in. And so the CLRB report, which is, again, incorporated by reference, says that Mr. Dixon didn't even arrive into the tower until 625. The deputies that were doing their beginning of the shift check encountered Mr. Bollinger at 648. That means Mr. Dixon was in that tower for approximately 15 to 17 minutes before that man down call came in. There is no allegation that the intercom or either the audio alert or the visual alert was something that Deputy Dixon saw and noticed and ignored. It's the opposite, that he didn't realize it until the man down call came in. And that's why the appellee's contention is that at worst, it's negligence and not a serious, I'm sorry, deliberate indifference to a serious medical need. I should also point out that although the decision on a 12B6 is reviewed de novo, the decision to deny leave to amend was proper, and it's reviewed under an abuse of discretion standard. The district judge's decision was well within his broad discretion because appellants had multiple opportunities to cure his pleading deficiencies and still has not made a plausible allegation to save his claims. Mr. Kish, don't go there, because if we review a dismissal of a complaint, we always review it de novo. I agree that the review of the dismissal is de novo. My point is only that the decision to deny leave to amend, that is an abuse of discretion standard. You're correct. And so to the extent that Mr. Richards now is able to come up with a fact that he forgot about or recently discovered that might save his claim, that doesn't change whether or not the district court judge abused the discretion in denying leave to amend. And the case law is clear that if the plaintiff is afforded multiple opportunities to cure his deficiency, then the judge is acting within his broad discretion to deny leave to amend. I also want to address the issue of the security check. I think that's another focal point of plaintiff's argument, and that pertains to Deputy Reyes. By plaintiff's own allegations, this occurred in the prior shift before Mr. Bollinger applied the ligature. And he conducted three security checks, one at 519, one at 525, and at the end of his shift at 601. Appellants only criticized the last check as being done too quickly. However, the first check at 519 by plaintiff's own allegations suggests that the cell door was open. So there must have been at least some interaction with Deputy Reyes and the inmate. And that number of checks taken as a whole and the complete absence of any allegation that Mr. Bollinger was in any medical distress completely defeats the plaintiff's allegations against Deputy Reyes. Even if Deputy Reyes' count was a technical violation of county policy because he didn't have a piece of paper with him or that a lieutenant subsequently criticized him for not having done it pursuant to policy. Again, that doesn't rise to the level of a constitutional violation. You want to talk about qualified immunity? Yes, Your Honor. That's the final point. Even if there was a constitutional violation, the individual defendants would still be entitled to qualified immunity. I think Mr. Richards suggests that we go back and allow this to be heard on motion for summary judgment. However, the qualified immunity defense is a defense that must be applied at the earliest possible opportunity. And exposing the individual defendants to further litigation, even if it is just to hear another motion, is a substantial burden for them. They're accused of participating or engaging in conduct that contributed to a man's death. That is no light accusation, and it's a significant burden to these deputies. In this context, the appellants haven't cited any other case where there was an intercom issue or a soft count or a security check that just because of the amount of time that it took contributed to a person committing suicide. With that, Your Honor, I see my time is up. Unless there's other questions, I appreciate the opportunity to be heard. Thank you very much. Mr. Richards, you have a couple of minutes for rebuttal. Thank you. I'm going to hit three points, Your Honors. One of them is we could have made a motion to amend the complaint earlier. The second is, what is the setup in the jail cell that would allow him to audio look at the various emergency alarm? And the third is, what are the statistics that make San Diego so uniquely more prone to suicide than any other jail? We did a timeline, and the removal came back in 2018. We filed our amendment to correct the second minute complaint two months later, in October of 2019, and have been waiting ever since for that ruling. Once we file our motion to amend, we had to redline the document. We had to show the court we can't just willy-nilly go change whatever we want. We were locked into the changes we thought we needed back in 2019, so we never got the opportunity to act on any of the discovery that we had to make the change. The second thing I'd like to show the court, and this is simply for helpful reasons, just to understand what's there. I realize this isn't in the complaint, but this is the botched tower that Nixon sits at up there. And if you see the glow of the blue ember, that's where he sits and looks at the jail cells, and when there is an emergency button, that blinks red. So he turned the mute down, but allowed that to keep blinking, and without explanation, that was blinking for over 25 minutes. Once he checked in and sat in this room, and he has no explanation of why he didn't notice it or get down there. This is the context of what he was sitting at and looking at, and why he admitted that the audio is the best way to hear it. Finally, as alleged in our complaint, San Diego has had five suicides. Counsel, before you go, I just wanted to go back to your first point. You said you filed a motion to amend the complaint, and it was pending and never decided, or did I mishear something? No, that's correct. We filed our second amendment back in October of 2019, and we waited until the day before the motion for summary judgment over a year to have that ruling. That was what we had been waiting for, because we were locked into those requested changes. We couldn't do anything about it until the court made a ruling, and it took the court over a year to make a ruling on that motion. That is true. We were waiting for that. He subsequently dismissed the case 30 days later. The final point, if I may add, is we had five suicides in 2013 in San Diego, six suicides in 2014, seven suicides in 2015, three suicides up until halfway of 2016, and at the same time period, all of L.A. County had one suicide. Since 2009, San Diego has had 40 suicides in its jail cell, by far the most of any of the jails in the state of California. With that, I thank the court very much for its consideration. Thank you. The case has been submitted.
judges: BEA, LEE, Bennett